UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CHRISTOPHER KELLER,

Petitioner,

v.

NETHANJAH BREITENBACH, et al.,

Respondents.

Case No. 3:22-cv-00481-ART-CLB

MERITS ORDER

Petitioner Christopher Keller has filed a counseled Second-Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 20 ("Second-Amended Petition").) This matter is before this Court for adjudication of the merits of the Second-Amended Petition, in which Keller alleges that his right to counsel of his choice was violated, the trial court erred in refusing to appoint new counsel, and his trial counsel was ineffective. (*Id.*) For the reasons discussed below, this Court grants the Second-Amended Petition based on the trial court's denial of Keller's constitutional right to counsel of his choice.

## I. BACKGROUND

### A. Factual background[1]

Officer Daniel Lopez with the Las Vegas Metropolitan Police Department ("LVMPD") testified that on January 28, 2016, at around 2:25 a.m., he saw a Dodge Stratus make a left turn at a high rate of speed. (ECF No. 26-43 at 9, 14.) Officer Lopez followed the Stratus and noticed that it had a broken taillight and was driving quickly in the center turn lane. (*Id.* at 17.) Deciding to conduct a traffic stop of the Stratus, Officer Lopez followed the Stratus into an apartment complex parking lot. (*Id.* at 19.) After parking the Stratus, Keller, the driver of the

---

[1]This Court makes no credibility findings or other factual findings regarding the truth or falsity of this evidence from the state court. This Court's summary is merely a backdrop to its consideration of the issues presented in the Second-Amended Petition.

Stratus, jumped out of the car. (*Id.* at 24.) Officer Lopez got out of his car quickly too and testified that he could "smell the odor of cannabis on [Keller], and [he could] smell it also coming from out of the vehicle." (*Id.* at 25.) Officer Lopez "made contact with [Keller] on his side of the car, and [then] walked him over towards the front of [his] patrol car." (*Id.* at 26.) Officer Lopez "conducted a pat-down for weapons," and because Officer Lopez believed that Keller had been trying to evade him and was a potential flight risk, Officer Lopez handcuffed Keller. (*Id.*) Officer Lopez removed Keller's wallet to check for his identification and found $2,187 cash in Keller's pocket. (*Id.* at 34.)

During this time, five gunshots rang out from another location in the apartment complex, so Officer Lopez "put [Keller] in the back of [his] patrol car for his safety." (*Id.* at 36.) After the gunshot incident was resolved, Officer Lopez looked inside Keller's car and "saw a green leafy . . . substance . . . on the floorboard." (*Id.* at 38.) According to Officer Lopez, because he "had probable cause that there was a controlled substance inside the vehicle, [he] began to do a search inside the vehicle." (*Id.* at 39.) Officer Lopez found a bag containing lots of smaller bags, which Officer Lopez testified are "commonly used to transport a controlled substance." (*Id.* at 40.) Due to the "size of the bags [found in Keller's car] and the large amount of money that was on his person, [Officer Lopez] called for a canine narcotics dog." (*Id.* at 45.) The narcotics dog got into Keller's car and "indicate[d] on the glove compartment of" Keller's car. (*Id.* at 49–50.) Officer Lopez then "applied for a telephonic warrant." (*Id.* at 51.) After a judge approved the warrant, some paneling was removed from the glove compartment, revealing a gun and controlled substances. (*Id.* at 53, 56–57.) The following controlled substances were found: (1) 351 grams of methamphetamine, (2) 36.4 grams of heroin, and (3) 0.8 grams of cocaine. (*Id.* at 75, 84, 87.)

After learning from Keller's car registration that Keller lived in the apartment complex where the vehicle search was taking place, Officer Lopez

1  successfully applied for another telephonic warrant to go inside Keller's
2  apartment. (*Id.* at 101.) Inside Keller's apartment, officers "found numerous
3  scales, more suspected meth, more suspected narcotics[,] . . . another firearm[,]
4  . . . a lot of TVs, a lot of purses, a large jar" containing 188.4 grams of marijuana,
5  three boxes of .22 Remington ammunition, and a 9-millimeter handgun. (*Id.* at
6  103, 122, 181–84.)

7  **B.    Procedural background**

8      Keller was charged with two counts of trafficking in a controlled substance,
9  possession of a controlled substance, four counts of possession of a controlled
10 substance with the intent to sell, and ownership or possession of a firearm by a
11 prohibited person. (ECF No. 26-3.) Keller retained Michael Sanft to represent him,
12 and a preliminary hearing was held on February 16, 2016. (ECF No. 26-2.) On
13 February 18, 2016, Keller was arraigned, pleaded not guilty, and invoked his
14 right to a speedy trial within 60 days. (ECF No. 26-4.) The trial court scheduled
15 Keller's trial for April 18, 2016. (*Id.*)

16          **1.  The Trial Court Delays Keller's Trial Date Three Times.**

17      At a pretrial conference on March 16, 2016, Sanft indicated that he was "in
18 the middle of drafting a motion to suppress," and the trial court indicated that it
19 would leave Keller's trial date. (ECF No. 26-5.) At the calendar call on April 13,
20 2016, Sanft represented that he was waiting for some discovery from the
21 prosecution before being able to file the motion to suppress and needed a
22 continuance. (ECF No. 26-9.) Keller expressed his frustration due to the State's
23 failure to provide timely discovery and due to Sanft's failure to file the motion to
24 suppress, "which was supposed to be in three weeks ago." (*Id.* at 4.) Keller also
25 reiterated that he had not and would not waive his speedy trial rights and would
26 like to go to trial as planned. (*Id.* at 3–4.) The trial court explained that there was
27 another "case in front of" Keller's case, so the trial court was vacating Keller's
28 trial and "going to be proceeding on" that other case. (*Id.* at 6.) Keller's trial was

1   rescheduled for May 2, 2016. (*Id.*)

2      At the calendar call on April 20, 2016, Sanft indicated that he was still

3   working on the motion to suppress. (ECF No. 26-10 at 3.) The trial court indicated

4   that it "can't hear anything next week," the week Keller's trial was currently

5   scheduled, so it was "going to . . . send this to overflow." (*Id.* at 4.) The trial court

6   then told Sanft that "if Mr. Keller insists on invoking his speedy trial, you'll have

7   to go forward on it and then it will be up to . . . the Chief Judge to make the

8   determination." (*Id.* at 5.)

9      On April 29, 2016, a hearing was held by the "overflow" court, and Sanft

10   moved to withdraw due to a conflict of interest with Keller. (ECF No. 26-12.) The

11   trial court granted the motion, vacated the trial date, and appointed Ken Frizzell

12   to represent Keller. (*Id.*) At Frizzell's confirmation of counsel hearing on May 4,

13   2016, Frizzell asked that Keller's trial be rescheduled within 60 days because

14   Keller "does not wish to waive his 60 day trial rights." (ECF No. 26-14 at 3.) The

15   trial court rescheduled the trial for June 27, 2016. (*Id.* at 5.)

16      At a pretrial conference on May 18, 2016, Frizzell stated that he was going

17   to be filing a suppression motion and asked for a status check in a few weeks.

18   (ECF No. 26-15.) Keller again expressed his frustration, explaining that Sanft

19   "went through the process of the preliminary hearing" to get information for the

20   motion to suppress, "[a]nd then on the day he was going to put it in was the day

21   he stepped . . . off of [the] case," meaning that Keller had now been "waiting five

22   months to get one motion done." (*Id.* at 5.) The trial court indicated that the trial

23   date would stand. (*Id.* at 6.)

24      At the status check on June 1, 2016, Frizzell indicated that he was still

25   working on the motion to suppress. (ECF No. 26-17.) Frizzell finally filed the

26   motion to suppress on June 10, 2016. (ECF No. 26-18.) On June 13, 2016, Keller

27   moved to dismiss Frizzell because Frizzell had failed to use a different

28   investigator, provide full discovery, file motions in a timely manner, and advocate

for his right to a speedy trial. (ECF No. 26-19.) A hearing was held on June 13, 2016, and Keller explained that he had filed "a complaint . . . with the Nevada Bar about the investigator" being used, and Frizzell explained that if he used a new investigator, "the trial might get continued because of it." (ECF No. 26-20.) The trial court then stated to Keller, "You don't want everything, do you? You want out on these type of charges. You don't want the attorney." (*Id.* at 7.)

A hearing was held on June 20, 2016, and the trial court vacated the trial date, indicating that it needed to hold an evidentiary hearing on the motion to suppress. (ECF No. 26-23.) The parties attempted to get the evidentiary hearing scheduled within a few days so that the trial date could still stand, but the trial court stated that Keller's trial instead would go to "overflow" the following week and that it could not "send it to overflow if there's any pending motions." (*Id.* at 5.) The trial was reset for July 25, 2016. (*Id.* at 6.)

## 2. Appointed Counsel Delays Keller's Trial Date.

At the calendar call on July 20, 2016, the trial court asked Keller if he still wanted new counsel appointed, and Keller responded that he has "just wanted one motion to be heard since [he has] been in custody six months" and that he "would like to keep [Frizzell] if that means [his] motion [would be] heard tomorrow." (ECF No. 26-25 at 3–4.) The evidentiary hearing on the motion to suppress was held the following day, July 21, 2016. (ECF No. 26-26.) Following testimony and argument by counsel, the trial court denied the motion to suppress. (*Id.* at 104.) At that hearing, the trial court also heard Keller's motion to dismiss Frizzell. (*Id.*) Keller explained that he could not get through to Frizzell's office and did not like the investigator Frizzell was using. (*Id.* at 105.) The trial court responded, "[w]ell you moved to - - you asked the Court to let Mr. Sanft off the case, all right? Why don't you do me a favor? Why don't you hire your own attorney? Then you can decide." (*Id.*)

Keller clarified that he had retained Sanft and explained that Frizzell was

1    not doing any investigating, was not visiting him, was not providing him with

2    discovery, and was not defending his right to a speedy trial. (*Id.* at 106–07.)

3    Frizzell then stated that (1) he had "gone over to see Mr. Keller a few times" and

4    his "investigator has been over probably a dozen times," (2) he did not "know that

5    [he could] even be ready to go forward" with the trial because he not been able to

6    "prepare for trial with [Keller] like [he] otherwise would," (3) he worried that going

7    to trial as scheduled would "be inviting an ineffective assistance argument down

8    the road," and (4) he would like a continuance of the trial date if the trial court

9    was "going to leave [him] on" the case. (*Id.* at 117–18.) The trial court then asked

10   Keller why he was "in such a hurry to go to trial on something like this," and

11   Keller reiterated that he "want[ed] to invoke [his] right to a speedy trial." (*Id.* at

12   118–19.)

13        The trial court denied Keller's request to remove Frizzell and warned Keller

14   that that if he "want[ed] to go forward [with the trial] on Monday," he would be

15   going to trial with an attorney who was unsure whether he could be prepared.

16   (*Id.* at 120.) Keller expressed his dissatisfaction with a continuance due to

17   Frizzell's unpreparedness but elected to "just be quiet" in light of the trial court's

18   refusal to dismiss Frizzell. (*Id.*) The trial court vacated the trial date and reset the

19   trial for September 19, 2016. (*Id.* at 121.)

20        On August 10, 2016, Frizzell moved to withdraw as counsel, explaining

21   that Keller was "refus[ing] to assist counsel in preparing" for trial. (ECF No. 26-

22   27.) On August 22, 2016, the trial court heard Frizzell's motion. (ECF No. 26-31.)

23   The trial court lectured Keller on Frizzell being forced to go to trial without Keller's

24   assistance, and Keller responded that Frizzell would not "communicate with [him]

25   in person," rather "[h]e only sends his investigator" who Frizzell knows has a

26   contentious relationship with Keller. (*Id.* at 3–4.) Keller also explained that (1) he

27   had not "even gotten [his] full discovery," (2) Frizzell "won't even try to get the

28   body camera that the officer had," (3) he has been fighting for his right to have a

trial within 60 days, and (4) he "could have went by [him]self without an attorney and done a lot better [job] at this point." (*Id.* at 4.) The trial court denied Frizzell's motion to withdraw. (*Id.*)

### 3. Keller Delays his Trial Date for Counsel to Obtain Video Evidence.

At the calendar call on September 14, 2016, the trial court asked Frizzell if he was ready for the trial, and Frizzell stated, "yes and no." (ECF No. 26-34 at 3.) Frizzell explained that at the evidentiary hearing on the motion to suppress, he "had been discussing with [the prosecution] about the possibility of looking for" the body camera footage. (*Id.* at 3.) Frizzell then explained that while the prosecution "has not been able to locate" the body camera footage, Keller "wants [him] to do a motion and is willing to . . . waive his speedy trial right in order for [him] to" file such a motion. (*Id.*) Keller confirmed that he was willing to waive his speedy trial rights under the circumstances given the importance to him of the body camera footage, and the trial court vacated the trial date to allow Frizzell to file the motion for the body camera footage and reset the trial for March 6, 2017. (*Id.* at 6.)

Four and a half months later, on February 1, 2017, at the pretrial conference, Frizzell acknowledged that he had failed to file the motion for the body camera footage. (ECF No. 26-36.) On February 7, 2017, Frizzell finally filed the motion for production of the body camera footage. (ECF No. 26-37.) A hearing was held on the motion on February 22, 2017. (ECF No. 26-38.) The prosecution stated that it "did a search of the body camera database . . . and there was no results from this particular event number." (*Id.* at 5.) The trial court never definitively ruled on the motion, but, instead, simply "grant[ed] any request that *Brady* would require." (*Id.* at 4.) The trial court then sent the case "to overflow," explaining that "[i]f there's a courtroom that can take the case, [Keller will] get that courtroom." (*Id.* at 7–8.)

7

### 4. Keller Seeks a Continuance to Substitute Retained Counsel.

On March 6, 2017, on the first morning of Keller's trial, the trial court noted that it had "just been handed a copy of Defendant Keller's substitution attorney, Amy Feliciano, appearance of record." (ECF No. 26-40 at 3.) Feliciano "ask[ed] the Court to allow [her] to substitute in," explaining that while she "just received today from Mr. Frizzell the file," she "notif[ied] the parties and chambers last week [on February 28, 2017] by e-mail that Mr. Keller's mother had retained [her]." (*Id.* at 3, 8.) Feliciano then elaborated that (1) "Mr. Keller's mother . . . got in touch with [her] in February, beginning of February, about retention," (2) at that time she had to "involuntary commit [her] 16-year-old son . . . for mental illness" and was herself suffering from seizures resulting in her hospitalization, and (3) "by the time [she] was able to work again and get back to normal, [she] contacted Mr. Keller's mother" and was formally retained with Keller's parents' savings on February 26, 2017. (*Id.* at 3–5.)

The trial court expressed concern with the substitution and continuance of the trial date, explaining, in part, that (1) it "set[s] trial dates because [it's] trying to move these cases," (2) it has "an availability to do this case now," (3) delaying the trial to allow substitution is "just not fair to the parties" and not "fair to the Court," and (4) Frizzell "prepared to go forward on this." (*Id.* at 5–6.) The prosecution opposed the continuance, arguing that it was only for the purpose of delay given that it had obtained a jail telephone call between Keller and his mother from February 27, 2017, in which Keller is heard "saying, great, that's great, [Feliciano] can then come in and I'll get rid of [Frizzell], and then [Feliciano] can file a bunch of motions and the DA will give me a better deal." (*Id.* at 7–8.) The trial court then stated that to Feliciano, "[i]f you want to substitute in, I'll grant that, but we're going to go to trial on this." (*Id.* at 9.) Feliciano argued that (1) Keller has "the right to counsel of his choosing," (2) she was "not doing this for the purposes of delay," and (3) she "was going to ask the Court just for a short

1    resetting of this case." (*Id.* at 10.)

2    **5. The Trial Court Denies Keller's Request for a Continuance.**

3    The trial court denied the motion to continue and ruled that Feliciano

4    would only be permitted to substitute in if she were ready to go to trial that

5    morning, explaining that (1) Keller's case had been going on for a long time, (2)

6    there had been a "number of substitutions," (3) it did not "see any benefit to

7    [Keller] or to this case at all to allow [Feliciano] to substitute in." (*Id.* at 11.)

8    Feliciano stated that she could not "effectively represent Mr. Keller or go to trial

9    in this" today, so she would be put "in a position where [she] would then need to

10   refund the fees that [she had] been paid." (*Id.*)

11   Frizzell then explained that he was informed by Keller on March 1, 2017,

12   that Keller had hired Feliciano and would not speak with Frizzell about the case.

13   (*Id.* at 12.) Accordingly, Frizzell had stopped preparing for trial, explaining that

14   "if you make this go today, . . . I am now being opened up . . . for an ineffective

15   assistance claim," and requested a continuance. (*Id.* at 12–13.) The trial court

16   disagreed, stating that Keller had been playing games with the court, that Keller

17   had "challenged other attorneys," that it was "confident" in Frizzell's abilities, and

18   that the trial had previously been continued five times. (*Id.* at 13–14.) Feliciano

19   attempted one last time to get a continuance, stating that Keller had filed a bar

20   complaint against Frizzell establishing that "there is a conflict and a breakdown

21   in communication" between Frizzell and Keller. (*Id.* at 17.) The trial court refused

22   to budge, stating, "[w]e're ready to start on the trial in this matter." (*Id.* at 17.)

23   **6. Keller is Convicted and Seeks Habeas Review.**

24   A jury found Keller guilty of seven drug-related crimes and two counts of

25   ownership or possession of a firearm by a prohibited person. (ECF No. 27-17.)

26   Keller was sentenced to an aggregate term of life in prison with parole eligibility

27   after 20 years. (*Id.* at 5.) Keller's amended judgment of conviction was entered on

28   December 12, 2017. (*Id.*) Keller appealed, and the Nevada Supreme Court

affirmed his judgment of conviction on October 15, 2018. (ECF No. 27-30.) Remittitur issued on November 9, 2018. (ECF No. 27-31.) Keller filed his *pro se* state post-conviction habeas petition on August 26, 2019. (ECF No. 27-37.) The state court denied Keller post-conviction relief on November 2, 2020. (ECF No. 28-3.) Keller appealed, and the Nevada Court of Appeals dismissed the appeal on September 28, 2021. (ECF No. 28-20.) Remittitur issued on October 26, 2021. (ECF No. 28-21.) Following a motion to amend the state court's order, the state court issued a new order on April 11, 2022. (ECF No. 28-28.) Keller appealed, and the Nevada Court of Appeals affirmed on September 9, 2022. (ECF No. 28-40.) Remittitur issued on October 4, 2022. (ECF No. 28-41.)

Keller commenced this federal habeas action on or about October 31, 2022. (ECF No. 1.) This Court granted Keller's request for the appointment of counsel and appointed the Federal Public Defender to represent Keller. (ECF Nos. 6, 11.) Keller filed his First-Amended Petition on February 17, 2023, and his instant Second-Amended Petition on August 9, 2023. (ECF No. 12, 20.) In his Second-Amended Petition, Keller presents the following grounds for relief:

1. The state court violated his right to counsel of his choice.
2. He was denied his right to counsel when the state court did not appoint new counsel even though his trial counsel was conflicted.
3. His counsel failed to include important facts and argue key legal issues in his motion to suppress the evidence found in his car and apartment.
4. His counsel failed to request an adverse inference instruction based on the destruction of body camera footage.
5. There were cumulative errors.

(ECF No. 20.)

Respondents moved to dismiss Keller's Second-Amended Petition, and this Court denied the motion, finding (1) ground 4 was timely, (2) grounds 1 and 2 were exhausted, (3) grounds 3 and 4 were technically exhausted and procedurally defaulted, and (4) ground 5 was unexhausted to the extent that it included grounds 3 and 4. (ECF No. 34.) This Court deferred consideration of whether

Keller could demonstrate prejudice under *Martinez v. Ryan* to overcome the procedural defaults of grounds 3 and 4 until after the filing of an answer and a reply. (*Id.*) Keller moved to voluntarily dismiss the unexhausted portion of ground 5, and this Court granted his request. (ECF Nos. 35, 36.)

Respondents filed their answer to the Second-Amended Petition on March 15, 2024, and Keller filed his reply on May 14, 2024. (ECF Nos. 37, 40.)

## II.    GOVERNING STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the first portion of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Lockyer v. Andrade*, 538 U.S. 63, 73, 75 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). And a state court decision involves an unreasonable application of Supreme Court precedent, within the second portion of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the

prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413).

## III.    DISCUSSION

### A.    Grounds 1 and 2—counsel of choice and unconflicted counsel

In ground 1, Keller alleges that the trial court violated his right to counsel of choice in violation of the Sixth and Fourteenth Amendments. (ECF No. 20 at 5.) And in ground 2, Keller alleges that he was denied his right to counsel when the trial court did not appoint new counsel even though Keller's trial counsel was conflicted in violation of the Fifth, Sixth, and Fourteenth Amendments. (*Id.* at 7.)

#### 1.    State court determination

In affirming Keller's judgment of conviction, the Nevada Supreme Court held as follows:

> Keller argues that the district court erred by not granting a continuance on the first day of trial to allow him to substitute private counsel for appointed counsel. "We review the denial of a motion for substitution of counsel for abuse of discretion." *Young v. State*, 120 Nev. 963, 968, 102 P.3d 572, 576 (2004). When determining whether the district court was within its discretion to deny a motion for substitution of counsel, we consider: "(1) the extent of the conflict; (2) the adequacy of the inquiry; and (3) the timeliness of the motion." *Id.* (quoting *United States v. Moore,* 159 F.3d 1154, 1158-59 (9th Cir. 1998)). Here, the district court was within its discretion to deny Keller's motion, because the conflict between Keller and his appointed counsel was not irreconcilable, the district court made an adequate inquiry, and the motion was untimely.
>
> *Extent of the conflict*
> While Keller previously moved to dismiss his appointed counsel over eight months before trial and had filed a bar complaint against him, Keller's primary conflict with his appointed counsel at the time of trial was counsel's use of an investigator Keller disliked. Keller's objection to appointed counsel's choice of investigator and a newfound ability to afford private counsel shortly before trial do not constitute an irreconcilable conflict. *Compare Brinkley v. State*, 101 Nev. 676, 678-79, 708 P.2d 1026, 1028 (1985) (characterizing reasons for substituting counsel as "unnoteworthy" when due to displeasure with a lack of communication and a newfound ability to afford private counsel), *and Rimer v. State*, 131 Nev. 307, 327, 351 P.3d 697, 711-712 (2015) (denying motion to substitute counsel where "private counsel had a different strategy and asked for a 90-day continuance"), *with Young,* 120 Nev. at 969, 102 P.3d at 576-77 (holding that there was "strong evidence of an irreconcilable conflict" where defendant complained about counsel five times to the court, moved to substitute counsel twice, and counsel disobeyed a court order to visit the defendant weekly).
> [FN1] Notably, the same private counsel was substituted

12

in after trial to handle Keller's sentencing. But after private counsel received three continuances, Keller moved to dismiss private counsel and the district court reappointed trial counsel.

*The adequacy of the inquiry*

The district court adequately inquired into the conflict between Keller and his appointed counsel. While the district court initially focused on efficiency and "trying to move cases" when ruling on Keller's motion, it was because private counsel did not say that the reason for attempting to substitute in was due to Keller's conflict with appointed counsel. Rather, private counsel focused on the reasons for waiting until the morning of the first day of trial to substitute as counsel. The court adequately considered those reasons, as well as appointed counsel's concerns and Keller's concerns as to appointed counsel's continued representation of Keller. *Cf. Young,* 120 Nev. at 970-71, 102 P.3d at 577 (error found where the district court "failed to inquire in any depth about [the defendant's] complaints" and "should have made a more thorough inquiry").

*The timeliness of the motion*

The third factor, the timeliness of the motion, balances a defendant's constitutional right to counsel against the inconvenience and delay that would result from the substitution of counsel." *Young,* 120 Nev. at 969-70, 102 P.3d at 577. "It is within the trial judge's discretion to deny a motion to substitute [counsel] made during or on the eve of trial if the substitution would require a continuance." *United States v. McClendon,* 782 F.2d 785, 789 (9th Cir. 1986); *Brinkley,* 101 Nev. at 679, 708 P.2d at 1028 ("Ordinarily, denial of such a motion for continuance, immediately prior to trial, is within the discretion of the trial court."). Keller knew for more than five months that he had a March 6 trial date. *See Rimer,* 131 Nev. at 326-27, 351 P.3d at 711-12 (motion to substitute counsel on the eve of trial was untimely where defendant knew trial date for over three months). But Keller did not hire private counsel until February, and then private counsel waited until the morning of March 6 to formally attempt to substitute into the case, and was not prepared to go to trial. Additionally, the State possessed a recorded phone call suggesting that Keller hoped to use private counsel "for dilatory tactics or bad-faith interference with the administration of justice." *Young,* 120 Nev. at 970, 102 P.3d at 577. Given that the motion to substitute counsel came on the eve of trial, and that granting the motion would require continuance to a seventh trial date, the district court had discretion to deny the motion. *See Rimer,* 131 Nev. at 326-37, 351 P.3d at 711; *see also Brinkley,* 101 Nev. at 679, 708 P.2d at 1028 (court was within its discretion to deny motion brought on hearing five days before trial).

(ECF No. 27-30 at 2–5.)

//

//

//

//

### 2.    Analysis of ground 1

#### a. The Nevada Supreme Court Applied the Rule for Appointed, not Retained, Counsel.

In ground 1 of his opening brief on direct appeal to the Nevada Supreme Court, Keller argued that "the district court erred in not allowing a continuance and to allow Amy Feliciano, Esq. to substitute in as counsel." (ECF No. 27-19 at 8.) As Keller's brief explained, "Keller's mother had retained private counsel (attorney Kenneth Frizzell is appointed and paid by the state) and done so in a timely fashion." (*Id.* at 9.)

The Nevada Supreme Court analyzed this ground under *Young v. State*, 102 P.3d 572 (Nev. 2004). (ECF No. 27-30 at 2.) The issue in *Young* was the trial court's denial of a motion to substitute court-appointed counsel with new court-appointed counsel. 102 P.3d at 576. In ruling on this issue in *Young*, the Nevada Supreme Court adopted and applied the Court of Appeals for the Ninth Circuit's three-factor test enumerated in *United States v. Moore*, 159 F.3d 1154 (9th Cir. 1998). *Id.* The three-factor test in *Moore* applies when a defendant has an irreconcilable conflict with court-appointed counsel. 159 F.3d at 1158. However, given that Keller was seeking to substitute his court-appointed counsel with privately retained counsel of his choosing—rather than substitute his court-appointed counsel with new court-appointed counsel—*Young* and *Moore* are inapplicable. Indeed, the Nevada Supreme Court has recently clarified that when a defendant seeks to replace court-appointed counsel with privately retained counsel, a *Patterson* analysis, rather than a *Young* analysis, should be applied. *See Brass v. State*, 507 P.3d 208, 189–190 (Nev. 2022). In *Patterson*, the Nevada Supreme Court discussed a defendant's right "to replace existing counsel with retained counsel" and applied *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006). *Patterson v. State*, 298 P.3d 433 (Nev. 2013).

Because (1) the *Young*/*Moore* analysis applies to cases involving the

substitution of new court-appointed counsel for prior court-appointed counsel, (2) the *Patterson*/*Gonzalez-Lopez* analysis applies to cases involving the substitution of privately retained counsel for court-appointed counsel, and (3) Keller sought to substitute Feliciano, who he privately retained, for Frizzell, who had been court-appointed, the Nevada Supreme Court's analysis of this ground should have been under *Patterson*/*Gonzalez-Lopez*. Accordingly, the Nevada Supreme Court's application of *Young*/*Moore* was contrary to clearly established Supreme Court precedent, namely *Gonzalez-Lopez*, under 28 U.S.C. § 2254(d)(1). As such, AEDPA review does not govern this ground, and the Court instead conducts a de novo review.[2]

### b. The State Court Violated Keller's Right to Counsel of Choice.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." "[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006); *see also United States v. Rivera-Corona*, 618 F.3d 976, 979 (9th Cir. 2010) ("A defendant who can hire his own attorney has a different right, independent and distinct from the right to effective counsel, to be represented by the attorney *of his choice*." (Emphasis in original)). A violation of this right amounts to structural error: "[n]o additional showing of prejudice is required to make the violation 'complete.'" *Gonzalez-Lopez*, 548 U.S. at 146.

Notably, a defendant's right to counsel of his choice can be limited by "a

---

[2]The difference in review—de novo review versus deferential review under AEDPA—distinguishes this case from *Torres-Mejia v. Howell*, No. 23-2344, 2025 WL 17098 (9th Cir. January 2, 2025), a case in which the Court of Appeals for the Ninth Circuit found, under similar facts, that the petitioner was not entitled to federal habeas relief on a choice of counsel claim.

trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness . . . and against the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152; *see also Rivera-Corona*, 618 F.3d at 979 ("In general, a defendant who can afford to hire counsel may have the counsel of his choice unless a contrary result is compelled by purposes inherent in the fair, efficient and orderly administration of justice." (Internal quotation marks omitted)). However, importantly, the trial court's discretion in balancing the defendant's "right to his chosen counsel against concerns of fairness and scheduling" must be reasonably exercised. *Miller v. Blacketter*, 525 F.3d 890, 896 (9th Cir. 2008).

Here, in balancing Keller's right to counsel of choice against concerns of scheduling and fairness, the trial court unreasonably exercised its discretion because (1) Keller had formally retained Feliciano, securing her physical presence before the trial court at the time the trial court denied the request for substitution, (2) Frizzell's representation of Keller was conflicted, and (3) the trial court unreasonably elevated expediency. The Court will discuss each of these issues in turn.

To begin, Keller had formally retained Feliciano, Feliciano had reached out to Frizzell to obtain his records on Keller's case, and Feliciano was physically present in court, showing Feliciano's willingness, desire, and intention to represent Keller. This was not a scenario where Keller was ambiguously debating whether to hire private counsel, requesting more time to find private counsel, or acquiring funds to be able to hire private counsel. Rather, Keller's family had already paid Feliciano $15,000 for her to represent Keller (*see* ECF No. 27-50 at 8. 27-37 at 56), and Feliciano had reached out to Frizzell and obtained Keller's case records. (ECF No. 27-50 at 42 (testimony of Frizzell at post-conviction evidentiary hearing).) The failure by the trial court to give due consideration to Feliciano's definiteness in representing Keller weighs on the side of the trial court wrongfully denying Keller's counsel of choice. *See Gonzalez-Lopez*, 548 U.S. at

148 (accepting the government's concession that a trial court wrongfully denied a defendant the right to counsel of choice where the court refused to grant pro hac vice admission to an attorney the defendant hired who was willing and prepared to begin representation immediately); *cf. Blacketter*, 525 F.3d at 896 (concluding that the trial court's "decision to deny the motions to withdraw and to postpone trial did not exceed his discretion to balance [the defendant]'s right to counsel of choice against concerns of fairness and scheduling" given that, *inter alia*, when the defendant's appointed counsel "moved to withdraw and to postpone trial, [the defendant] had not yet retained another attorney").

Next, there was a conflict between Keller and Frizzell given that Keller took continuous issue with Frizzell's trial preparation, which should have weighed in favor of granting the substitution and continuance. *See Rivera-Corona*, 618 F.3d at 980 ("Conflict between the defendant and his attorney enters the analysis only if the court is required to balance the defendant's reason for requesting substitution against the scheduling demands of the court.") *cf. Blacketter*, 525 F.3d at 896 (concluding that the trial court's "decision to deny the motions to withdraw and to postpone trial did not exceed his discretion to balance [the defendant]'s right to counsel of choice against concerns of fairness and scheduling" given, *inter alia*, that the defendant "did not express any dissatisfaction with [his appointed counsel]'s representation until the day his father offered to pay for a private attorney"). This conflict manifested itself in various ways before the trial.

First, the body camera footage issue exemplified the emerging breakdown between Keller and Frizzell.  On September 14, 2016, Frizzell convinced Keller to waive his speedy trial rights, which Keller had previously and steadfastly refused to waive, on the promise that Frizzell would file a motion for production of the body camera footage; however, four-and-a-half months later, at the beginning of February 2017, Frizzell admitted that he forgot this promise. Relatedly, although

1    Keller was not entitled to an adverse inference instruction given LVMPD's lack of

2    bad faith in destroying the body camera footage, which is discussed in ground 4,

3    Frizzell made several errors regarding the body camera footage: (1) he failed to

4    force the trial court to give an exact ruling on the motion for production of the

5    body camera footage, allowing, instead, for the trial court to simply tell the

6    prosecution to look for it, (2) he failed to ensure that the body camera was looked

7    for under both event numbers that were generated that night, and (3) he failed to

8    argue that the district attorney was put on notice of the significance of the body

9    camera footage at the time of the preliminary hearing, which was still within the

10   45-day retention window.

11         Second, in November 2016, Keller's mother informed Frizzell "that they

12   were not going to be using [him] and they were going to be hiring private counsel."

13   (ECF No. 27-50 at 42.) Based on this notice, Frizzell did not do much, if any, work

14   on Keller's case from November 2016 until March 2017. (*See* ECF No. 27-37 at

15   55 (visitor logs from the jail showing that, from January 28, 2017, until March 2,

16   2017, Frizzell only visited Keller on March 1, 2017, for thirty minutes).) Rather,

17   given that Frizzell mentioned on several occasions that he would "be inviting an

18   ineffective assistance argument down the road," it appears that Frizzell was more

19   concerned with his own interests than Keller's.

20         In sum, Frizzell was negligent in working on Keller's case and was then

21   wholly unprepared to effectively represent Keller on the morning of trial,

22   assuming that he would be relieved as counsel. These issues should have been

23   at the forefront of the trial court's balancing of Keller's request for substitution

24   against the scheduling demands of the court, but given the trial court's lack of

25   understanding of Keller and Frizzell's conflict—evidenced by the trial court's

26   repeated denial of motions to relieve Frizzell—the trial court failed to give this

27   issue necessary consideration.

28         Finally, the trial court unreasonably elevated expediency. *See Rivera-*

*Corona*, 618 F.3d at 979–80 ("Unless the substitution would cause significant delay or inefficiency or run afoul of the other considerations . . . , a defendant can fire his . . . appointed lawyer and retain a new attorney for any reason or no reason."). The trial court would only allow Feliciano's substitution if the trial was not continued; however, this inflexibility in allowing a continuance was arbitrary and inconsistent with the trial court's prior statements. The continuances in this matter were unrelated to Keller personally and largely unavoidable: (1) on April 13, 2016, the trial was continued due to the trial court's calendar, (2) on April 29, 2016, the trial was continued due to Sanft's withdrawal, (3) on June 20, 2016, the trial was continued due to the need to hold an evidentiary hearing, (4) on July 21, 2016, the trial was continued due to Frizzell not being ready, and (5) on September 14, 2016, the trial was continued to allow Frizzell to file a motion for the body camera footage. *See Bradley v. Henry*, 510 F.3d 1093, 1097 (9th Cir. 2007) ("To excuse the denial of counsel of choice because of delays largely produced by the court itself is objectively unreasonable."). Importantly, the prosecution did not object to any of these continuances. Additionally, the trial court never inquired how long Feliciano needed to prepare. *See United States v. Brown*, 785 F.3d 1337, 1349 (9th Cir. 2015) (concluding that the trial court erroneously "made no effort to ascertain how long the newly appointed attorney would likely need to prepare for trial" in denying the defendant's motion to substitute counsel). Finally, the trial court had previously asked Keller why he was in such a hurry to go to trial and if Keller would do it a favor by hiring his own attorney. These statements are inconsistent with the trial court then insisting that the trial was immoveable, especially since it stated at the final calendar call that the trial was going to overflow and might not even happen as scheduled. (*See* ECF No. 26-38 at 7–8.)

### c. This Structural Error Merits Habeas Relief.

In conclusion, the Court finds that the trial court unreasonably exercised

its discretion in denying Keller's request for a continuance to allow Feliciano's substitution because this decision failed to balance Keller's constitutional right to counsel of his choice against the concerns of scheduling and fairness. *Gonzalez-Lopez*, 548 U.S. at 152; *Rivera-Corona*, 618 F.3d at 979. Indeed, given the circumstances previously discussed, the trial court's decision infringed on Keller's constitutional right without a counterargument grounded in the need for the fair, efficient, and orderly administration of justice. *See Brown*, 785 F.3d at 1347 (holding that "neither the reasons the district court offered after its own detailed inquiry, the additional reasons the government has suggested in its briefing, nor any reason we can infer from the record, provide[d] any ground necessary to the fair, efficient, and orderly administration of justice to justify the denial of Brown's motion" to substitute retained counsel). As such, the trial court's ruling violated Keller's constitutional rights, and because this infringement amounts to structural error, Keller is granted federal habeas relief for ground 1.[3]

### 3. Analysis of ground 2

"Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). To establish a violation of the right to conflict-free counsel, the petitioner must show that an "actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348 (1980). "'[A]n actual conflict of interest' [means] precisely a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002); *see also McClure v. Thompson*, 323 F.3d 1233, 1248 (9th Cir. 2003) ("The client must

---

[3]As a practical matter, it may be redundant to discuss the remaining grounds given that this Court has already concluded that Keller is entitled to federal habeas relief and a retrial. However, in an abundance of caution, this Court discusses them as follows.

demonstrate that his attorney made a choice between possible alternative courses of action that impermissibly favored an interest in competition with those of the client."). "[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler*, 446 U.S. at 350-51; *see also Sanders v. Ratelle*, 21 F.3d 1446, 1452 (9th Cir. 1994) ("Once an actual conflict has been demonstrated, prejudice is presumed since the harm may not consist solely of what counsel does, but of what the advocate finds himself compelled to *refrain* from doing, not only at trial but also during pretrial proceedings and preparation." (internal quotation marks omitted) (emphasis in original)).

The Nevada Supreme Court appears to have reasonably determined that no actual conflict of interest existed which would have affected Frizzell's efforts on behalf of Keller. Despite Frizzell's apparent concern about his own interests, given that he mentioned future ineffective-assistance-of-counsel claims, Keller demonstrates only the mere possibility of a conflict of interest, not that Frizzell actively represented conflicting interests, especially since Frizzell's own self-interests in preventing future ineffective-assistance-of-counsel claims aligned with Keller's interests. *See United States v. Baker*, 256 F.3d 855, 860 (9th Cir. 2001) (explaining that "[a]n attorney has an actual, as opposed to a potential, conflict of interest when, during the course of representation, the attorney's and the defendant's interests diverge with respect to a material factual or legal issues or to a course of action").

Turning to Keller's argument about there being a breakdown in his relationship with Frizzell, this Court agrees that Keller and Frizzell's relationship was strained. *See United States v. Moore*, 159 F.3d 1154, 1158-59 (9th Cir. 1998) (fashioning a three-part test to determine whether a conflict rises to the level of being irreconcilable: "(1) the extent of the conflict; (2) the adequacy of the inquiry [by the trial court]; and (3) the timeliness of the motion"). Indeed, Keller moved to

dismiss Frizzell, Frizzell moved to withdraw as counsel, Keller filed a bar complaint against Frizzell's investigator, Keller used vitriolic language when referring to Frizzell in a recorded jail phone call, and Keller told Frizzell that he refused to assist in preparing for trial. This Court also agrees that Keller's motion to dismiss Frizzell, which was made almost 9 months before trial, and Frizzell's motion to withdraw, which was made 7 months before trial, were timely. That being said, the Ninth Circuit has determined that "[e]ven if [a petitioner] were successfully able to demonstrate a complete breakdown in communication or prove that an irreconcilable conflict existed under the *Moore* factors, [an] irreconcilable-conflict claim would still fail" because the Supreme Court "has never held that an irreconcilable conflict with one's attorney constitutes a per se denial of the right to effective counsel." *Carter v. Davis*, 946 F.3d 489, 508 (2019) (explaining that "AEDPA conditions habeas relief on a determination that the state-court decision unreasonably applied 'clearly established Federal law' as pronounced by the U.S. Supreme Court" (citing 28 U.S.C. § 2254(d)(1))).

Because Keller has not shown that an actual conflict of interest existed or that he is entitled to federal habeas relief based on an irreconcilable conflict with Frizzell, the Nevada Supreme Court's determination that Keller's instant claim lacked merit constituted an objectively reasonable application of federal law and was not based on an unreasonable determination of the facts. Keller is not entitled to federal habeas relief on ground 2.

**B.    Ground 3—counsel's failures regarding the motion to dismiss**

In ground 3, Keller alleges that his trial counsel ineffectively failed to include important facts and key legal issues in his motion to suppress the evidence found in his car and apartment in violation of the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 20 at 11.) Specifically, Keller argues that his trial counsel should have argued that he was improperly detained for a minor traffic violation, he was handcuffed and placed in patrol car prior to any probable

cause being established, his consent to search his wallet was involuntary, officers searched his car without probable cause, and the items found during the search of his car and apartment should have suppressed as fruit of the poisonous tree. (*Id.* at 11–12.)

### 1.    Procedural default

Keller previously acknowledged that ground 3 is unexhausted, but he contended that it was technically exhausted and that he could demonstrate cause and prejudice to overcome the procedural default pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). (ECF No. 34 at 8.) This Court found that Keller had arguably met three of the elements under *Martinez*: (1) he had no counsel during his initial-review collateral proceeding, (2) his state post-conviction petition was the initial proceeding regarding claims of ineffective assistance of trial counsel, and (3) Nevada law requires that a claim of ineffective of assistance of trial counsel be raised in a post-conviction habeas corpus proceeding. (*Id.* at 9–10.) However, because the analysis of prejudice under *Martinez* to overcome the procedural default of ground 3 is necessarily intertwined with the merits of ground 3, the Court deferred a determination of the fourth element of *Martinez*: whether ground 3 is substantial. (*Id.* at 10.) On this issue, this Court's review is de novo. *See Ramirez v. Ryan*, 937 F.3d 1230, 1243 (9th Cir. 2019).

### 2.    Background information

Keller's trial counsel filed a 13-page pretrial suppression motion. (ECF No. 26-18.) In that motion, Keller's trial counsel's argument was summed up as follows:

> Nevada law prohibits a custodial arrest for a misdemeanor or traffic violation. Officer Lopez stopped [Keller] for making an "abrupt turn" that Lopez interpreted as evasive, but not unlawful. [Keller] attempted to exit his vehicle but was detained and handcuffed—seized—because he smelled like marijuana (a possible misdemeanor) and appeared nervous and had committed three misdemeanor traffic offenses. Officer Lopez had no right to escalate the traffic stop into a full custodial arrest. If [Keller] did smell of marijuana (which he denies), the proper course of action would have been to perform a

field sobriety test to see if he was driving impaired. This was not done. Instead, Officer Lopez claimed to see marijuana residue on the floor of a parked vehicle in the dark of a January morning. This marijuana was never recovered.

   [Keller] was arrested in violation of NRS 484A.730 and NRS 171.1771 as well as controlling precedent from the Supreme Court of Nevada and the Supreme Court of the United States. Based on the statutes and authority cited herein, . . . Keller requests all evidence seized from his vehicle on January 28, 2016 be suppressed.

(*Id.* at 13.) An evidentiary hearing was held on Keller's motion, and Officer Lopez testified. (ECF No. 26-26.) The trial court denied the motion to suppress after lengthy arguments by the parties. (*Id.* at 83–104.)

### 3.    Effective Assistance of Counsel Standard

   In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

### 4.    Analysis

   The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures." "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809–810 (1996). Further, "[a]n automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances," and, "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810. Here, Officer Lopez had probable cause to believe that various provisions of Nevada's traffic code had been violated because Keller was driving with a broken taillight and was driving quickly in the center turn lane. *See* Nev. Rev. Stat. 484D.145. Therefore, the temporary detention of Keller for the purposes of a traffic stop was reasonable.

Next, "[i]n determining whether an investigative detention has ripened into an arrest, [Courts] consider the totality of the circumstances." *United States v. Baron*, 860 F.2d 911, 914 (9th Cir. 1988). However, "the police may move a suspect without exceeding the bounds of the *Terry*-stop when it is necessary for safety or security reasons." *Id.* at 915. Here, Officer Lopez placed Keller in handcuffs because he believed he was a flight risk given that he jumped out of his car following the traffic stop and then placed Keller in the back of his patrol car for safety purposes after gunshots were heard nearby. Given these circumstances, although his trial counsel certainly could have argued these points in his suppression motion, Keller fails to demonstrate that the trial court would have found that these actions amounted to an arrest.

Then, regarding Officer Lopez's search of Keller's wallet following Keller's alleged consent, where "the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied."

*Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). "Voluntariness is a question of fact to be determined from all the circumstances." *Id.* at 248–49. And "[i]n examining all the surrounding circumstances to determine if in fact the consent was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Id.* at 229. Here, Officer Lopez testified that after placing Keller in handcuffs, he "ask[ed Keller] if his ID [was] on his person; he says yes. [Officer Lopez] asked him where it was; he said it was in his front pocket. [Officer Lopez] asked him if [he] could remove it; he said yes." (ECF No. 26-43 at 27.) It is true that Keller was handcuffed when he gave permission for Officer Lopez to obtain his identification out of his wallet. However, given that Officer Lopez was only obtaining Keller's identification for the traffic stop—and not outright searching his wallet—Keller fails to demonstrate the applicability of his alleged involuntary consent.

Turning to the search of Keller's car, officers may search a vehicle and any containers found therein without a warrant so long as they have probable cause to believe the vehicle contains evidence of a crime. *See, e.g., Wyoming v. Houghton*, 526 U.S. 295, 300 (1999) (explaining that contraband goods concealed and illegally transported in an automobile or other vehicle may be searched without a warrant where probable cause exists); *California v. Acevedo*, 500 U.S. 565, 580 (1991) (holding that "the police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained"). Here, Officer Lopez testified that he "had probable cause that there was a controlled substance inside the vehicle" because (1) "while [he] was by the car door, [he] saw a green leafy . . . substance, actually, on the floorboard," which he identified as marijuana, (2) he "smelt marijuana on [Keller]," and (3) he "smelt marijuana coming from the car." (ECF No. 26-43 at 38–39.) Even though Keller disputes the reliability of these statements, he fails to refute them, and, as such, fails to refute that probable cause existed.

Finally, regarding the suppression of items found during the search of Keller's car and apartment under the fruit-of-the-poisonous-tree doctrine, "evidence later discovered and found to be derivative of an illegality" must be suppressed along with the "primary evidence obtained as a direct result of an illegal search or seizure." *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (internal quotation marks omitted). Because Keller fails to demonstrate that an illegal search or seizure took place, Keller fails to demonstrate that the fruit-of-the-poisonous-tree doctrine comes into play.

In sum, even if this Court agrees that Frizzell could have made more vigorous arguments in his suppression motion, given the facts of this case, Keller fails to demonstrate that the trial court would have granted the suppression motion. Because Keller fails to demonstrate that a more thoroughly argued suppression motion would have been meritorious, Keller fails to demonstrate that his counsel was deficient. *Strickland*, 466 U.S. at 688; *see also Ortiz-Sandoval v. Clarke*, 323 F.3d 1165, 1170 (9th Cir. 2003) (explaining that a "petitioner must show that . . . the overlooked motion to suppress would have been meritorious"); *Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986) (explaining that in alleging that counsel failed to file a pretrial motion to suppress evidence, the petitioner must establish, in part, a reasonable probability that the evidence would have been suppressed). Accordingly, ground 3 is not substantial for purposes of *Martinez*, is procedurally defaulted, and is dismissed.

### C.    Ground 4—counsel's failures regarding jury instructions

In ground 4, Keller alleges that Frizzell ineffectively failed to request an adverse inference instruction based on the destruction of body camera footage in violation of his Sixth and Fourteenth Amendment rights. (ECF No. 20 at 12.)

#### 1.    Procedural default

Like ground 3, Keller previously acknowledged that ground 4 is unexhausted, but he contended that it was technically exhausted and that he

could demonstrate cause and prejudice to overcome the procedural default pursuant to *Martinez v. Ryan*. (ECF No. 34 at 8.) And like ground 3, this Court found that Keller demonstrated cause under *Martinez*, but it deferred consideration of the prejudice analysis until this time. (*Id*. at 9–10.)

### 2.    Background information

LVMPD Officer Jacob Henry testified that he responded to Keller's apartment complex after LVMPD Officer Lopez requested additional units. (ECF No. 26-45 at 146, 148.) Officer Henry testified that he was wearing an operational body camera while searching Keller's car and that after his shift, he "plug[ged] it into the docking system at [their] area command" to "upload the videos on to the database." (*Id*. at 152–53.) Officer Henry then testified that when he later checked the database, the recording was not there. (*Id*. at 154.) According to Officer Henry, he believed he failed to flag the recording to retain it longer than the standard 45 days to prevent it from being deleted. (*Id*.)

### 3.    Standard

The prosecution's loss or destruction of potentially exculpatory evidence violates due process only when the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). Moreover, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *see also Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004). "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.*. Negligence in failing to preserve potentially useful evidence is not sufficient to constitute bad faith and

28

does not violate due process. *See id.* at 58; *see also United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993).

### 4.    Analysis

Even if this Court were to assume, *arguendo*, that the body camera footage was potentially useful, Keller fails to demonstrate that Officer Henry acted in bad faith in failing to flag the recording to prevent it from being deleted. Indeed, Officer Henry took steps to preserve this evidence by plugging his body camera into the docking station at the end of his shift so that the video would be uploaded to the database. (ECF No. 26-45 at 153.) Officer Henry testified that "if [he] did not specifically tag a video to retain it for longer, it . . . would just auto delete itself" after 45 days. (*Id.* at 154.) Officer Henry testified that he could not "recall if [he] did or did not [tag the video], but based on it not being there anymore, [he] would say it's safe to assume [he] did not." (*Id.* at 155.) This Court finds Officer Henry's actions amount to, at most, mere negligence—not bad faith. As such, because Keller would not have been entitled to an instruction that the body camera footage was presumed to have been favorable to the defense, Keller's trial counsel's request for such a jury instruction would not have been fruitful. Thus, Keller fails to demonstrate deficiency or prejudice under *Strickland*. Because Keller's ineffective assistance of trial counsel claim is not substantial, Keller fails to demonstrate the requisite prejudice necessary to overcome the procedural default of ground 4. Ground 4 is dismissed.

### D.    Ground 5—cumulative error

In ground 5, Keller alleges that the cumulative effect of the errors at trial violated his right to due process, in violation of the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 20 at 14.) As a reminder, this Court dismissed this ground to the extent it included grounds 3 and 4. (ECF No. 36.) Consequently, in determining whether cumulative error warrants relief, this Court looks to only grounds 1 and 2. Because this Court has already determined that ground 1

warrants the granting of relief and ground 2 does not warrant the granting of relief, there are no errors to cumulate. Ground 5 is denied.

## IV.    CONCLUSION[4]

It is therefore ordered that the Second-Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 20) is granted as to ground 1. Petitioner Christopher Keller's amended judgment of conviction filed on December 12, 2017, in case number C-16-312717-1, in the Eighth Judicial District Court for the State of Nevada is vacated. Within 180 days[5] of the later of (1) the conclusion of any proceedings seeking appellate or certiorari review of this Court's judgment, if affirmed, or (2) the expiration for seeking such appeal or review, the state court must—consistent with this Order—commence jury selection regarding the State of Nevada's Third-Amended Information filed on March 10, 2017.

It is further ordered that, to the extent necessary, a certificate of appealability is denied for grounds 2, 3, 4, and 5.

It is further ordered that the Clerk of the Court is directed to (1) enter judgment accordingly, (2) provide a copy of this Order and the Judgment to the Clerk of the Eighth Judicial District Court for the State of Nevada in connection with that court's case number C-16-312717-1, and (3) close this case.

DATED THIS 16th day of May 2025.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

---

[4]Keller requests that this Court conduct an evidentiary hearing. (ECF No. 20 at 15.) This Court declines to do so because it can decide the merits of the Second-Amended Petition on the record.

[5]Reasonable requests for modification of this time may be made by either party.